# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

DORIS A. SHREAVES,

      Plaintiff,

v.                ACTION NO. 2:13cv17

CAROLYN W. COLVIN,[1]
Acting Commissioner
of Social Security,

      Defendant.

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

    This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

    Plaintiff brought this action under 42 U.S.C. §§ 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act. The undersigned recommends that the decision of the Commissioner be VACATED and REMANDED to the Commissioner for further analysis consistent with this Report and Recommendation.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is substituted for Michael J. Astrue as the defendant in this suit. *See* Fed. R. Civ. Proc. 25(d).

# I. PROCEDURAL BACKGROUND

Plaintiff protectively applied for DIB and SSI on September 5, 2009, alleging disability since May 16, 2009,[2] caused by lumbar spine impairment, severe back pain, multiple joint arthritis, hypertensive cardiovascular disease, hypertension, and depression. R. 200.[3] Plaintiff's applications were denied initially and on reconsideration. R. 86-134. Plaintiff requested a hearing by an Administrative Law Judge (ALJ), which occurred on August 2, 2011. R. 38-62. Plaintiff, represented by counsel, and a vocational expert testified before the ALJ. R. 38-62.

On September 1, 2011, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. R. 23-33. The Appeals Council denied Plaintiff's request for administrative review of the ALJ's decision. R. 5-7. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).

# II. FACTUAL BACKGROUND

A. Plaintiff's Background

Born in 1963, Plaintiff was forty-five years old on her alleged disability onset date and forty-eight years old at the time of her administrative hearing. R. 41. She injured her back on a trampoline in July 2005, and underwent a lumbar laminectomy at L4-5 in October 2006. R. 422. She has past relevant work as an owner and manager of a towing company, bank teller, floral shop sales and delivery person, and daycare provider. R. 58. She last worked in 2005 taking care of paperwork for a crabbing business she owned with her husband. R. 41. When they lost the business, she did not look for other work due to the onset of her back problems. R. 41-42.

---

[2] Plaintiff's previous application for disability was denied on May 15, 2009. R. 63-74.
[3] The citations in this Report and Recommendation are to the Administrative Record.

B. Plaintiff's Medical History

Plaintiff alleges a disability onset date of May 16, 2009. R. 176, 179, 201. Evidence dated shortly before plaintiff's alleged onset date shows that on September 2, 2008, she first saw family practitioner David Hoshino, M.D. R. 279, 348.  Plaintiff had back pain, which she rated as a "5" on a scale of one to ten, radiating into her legs, but with no numbness or tingling. R. 279, 348. Her medications included Lexapro, Clonazepam, Vicodin, and Gabapentin. R. 279.  It was noted that Plaintiff underwent back surgery at L4-5 in October 2006, but did not have significant improvement in her pain. R. 279.  While tearful, Plaintiff was described as "well-appearing" and in "no acute distress." R. 279.  An examination revealed tenderness of the lower midline in the lumbar region and slight tenderness of the right paraspinal muscles, flexion limited to 80 degrees and lateral bending to 15 degrees with pain, almost immediate lower back pain with straight leg raising[4] bilaterally. R. 279.  Her reflexes and gait were normal. R. 279. Plaintiff was diagnosed with back pain, headache, and depression. R. 280, 349. She was referred to the indigent pharmacy and for x-rays if possible. R. 280.  It was recommended that she seek counseling for depression. R. 280.

On September 5, 2008, Plaintiff returned complaining of back pain rated at a "5" on a scale of 1 to 10, and requested to see a different provider. R. 346.  She had "some pain" with straight leg raising, and cervical tenderness. R. 346.  A nurse practitioner wrote in plaintiff's chart "consider drug seeker." R. 346.  She was prescribed Flexeril and Celexa. R. 346.

At a follow-up on September 10, 2008, Plaintiff complained of a severe headache that hurt even to touch her head, and rated her pain as a "7." R. 275. Methadone was prescribed. R.

---

[4] The straight leg raising test is negative when an individual does not complain of pain when her fully-extended leg is raised to more than a 60 degree level, out of a possible maximum of 90 degrees, while lying in the supine position, indicating a lack of radicular pain. Richard A. Rothman and Frederick A. Simeone, *The Spine*, 696-98 (3d ed. 1992).

276.   She stated that she felt she needed narcotics for back pain because she had more energy and was more functional when taking them. R. 275.  On September 30, 2008, Plaintiff reported "0" pain on a scale of one to ten. R. 342.

On October 31, 2008, Plaintiff stated that her pain, which she rated as a "5," was "tolerable but still present" and occasionally radiating to her legs with paresthesias. R. 271. She reported taking medication without side effects. R. 271.   Her straight leg raising test was negative. R. 271.  Dr. Hoshino diagnosed back pain, headache, chronic pain syndrome, tremor, and hypertension. R. 271. He prescribed Methadone and Propranolol. R. 272. No significant changes were noted on November 25, 2008, and December 8, 2008, where Plaintiff rated her pain as a "4" and "3-4" respectively. R. 267-270.  X-rays of the left knee taken on December 8, 2008, showed no fracture or disalignment, but a joint effusion and degenerative changes. R. 303.

On February 2, 2009, Plaintiff needed her medications refilled.  She was a bit stiff, but rated her pain as "0." R. 332, 445. Dr. Hoshino documented that plaintiff's mood/affect was "pleasant." R. 255. He assessed her as having chronic pain syndrome. R. 255-56.   The assessment was the same on March 3 and 23, 2009, when Plaintiff rated her pain was a "5" and "6." R. 326, 443.

Plaintiff reported to Dr. Hoshino in May 2009, that she was taking methadone as needed, and that her pain on a 10-point scale was a "5." R. 255. On July 9, 2009, Plaintiff reported headaches three to four times a day, which responded well to Advil after 45 minutes. R. 252, 384.  She rated her pain as an "8." R. 252, 384.  Plaintiff was alert and oriented, but had an anxious affect. R. 252, 384. On exam, Dr. Hoshino noted tenderness in the coccyx, tenderness over the lower pole patella, and medial joint space tenderness. R. 252, 384. Dr. Hoshino assessed plaintiff as having headaches, depression, hypertension, a rash, lower leg pain, nausea, and

4

osteoarthritis of the left leg. R. 253, 385.  He prescribed Pramosone cream. R. 253, 385.

Plaintiff was seen for a routine follow-up on September 9, 2009. R. 317, 382. At that time plaintiff was living with her parents and was experiencing "[l]ots of stress." R. 317, 382. Her straight leg raising test was negative with some knee pain. R. 317, 382.  Plaintiff rated her pain on a 10-point scale at a "6." R. 317, 382.

Also on September 9, 2009, Dr. Hoshino completed a spinal impairment questionnaire on plaintiff's behalf and indicated that he had been treating plaintiff every two months, for a year. R. 311. Plaintiff's diagnoses included chronic low back pain, cervicalgia, knee pain, depression, and anxiety. R. 311. Clinical findings included cervical and lumbar limited range of motion. R. 311.  Dr. Hoshino checked off boxes on the questionnaire indicating that plaintiff was not a malingerer, was incapable of handling low stress, and would frequently need to take five-minute unscheduled breaks. R. 312. Her symptoms would interfere with keeping her neck in a constant position. R. 312.  He opined that plaintiff would not be able to do a full-time competitive job that required activity on a sustained basis. R. 312. He further opined that she would likely be absent from work more than three times per month. R. 312.  He stated that the symptoms and limitations identified in the questionnaire were present since approximately 2006. R. 313.

On December 7, 2009, Plaintiff complained of abdominal distension and loss of appetite. R. 314, 379, 440. Her pain was noted as "4" on a 10-point scale. R. 314.  She was observed to be anxious and slightly diaphoretic. R. 314.  An examination revealed distension of the abdomen and coccyx tenderness. R. 315, 380, 441. It was felt that she was having gastrointestinal side-effects from taking Methadone; however, Plaintiff reported that Methadone seemed to help and that she wanted to continue taking it. R. 314.  Dr. Hoshino assessed plaintiff as having generalized abdominal pain, chronic pain syndrome, unspecified back pain, depression, and

flushing. R. 315, 380, 441.

When plaintiff saw Dr. Hoshino again in March 2010, she reported feeling tense at night, but otherwise was "doing okay." R. 362, 438. There was "lots of drama in [her] family." R. 362. On examination, plaintiff reported tenderness in the lumbar spine and coccyx area. R. 362. She rated her pain at a "4." R. 362. Her straight leg raising test was negative. R. 363, 439. Neurologically, plaintiff had normal strength, sensation, and deep tendon reflexes. R. 363. Her extremities showed no edema, cyanosis, or clubbing. R. 362. Dr. Hoshino assessed plaintiff as having unspecified back pain, a vitamin D deficiency, hypertransaminemia (concerning liver enzymes/liver function), chronic pain syndrome, and depression. R. 363.

Plaintiff underwent a consultative examination by Mark Clarke, M.D., on April 5, 2010. R. 394-97. At that time, plaintiff reported that she had back surgery in 2006, but her pain had gotten progressively worse since then. R. 394.  Her daily back pain was a "4-5" on a 10-point scale on average, but up to "6 or 7." R. 394. She estimated that she could stand for 10-15 minutes at one time or walk 150 feet, sit for 30-45 minutes, and lift a maximum of 5-10 pounds. R. 394. Plaintiff also reported depression, mood swings, and crying easily. R. 394.  On examination, plaintiff had some limitation of motion in her back, but her other joints were within normal limits. R. 396, 398. Dr. Clarke observed that she was tearful during the examination when moving her back and legs. R. 395. The examination revealed moderate crepitus of the knees, flexion of the knees limited to 105 degrees bilaterally, flexion of the hips to 90 degrees, some tenderness of the lower back, flexion of the spine to 65 degrees, poor spine extension, and slightly decreased lateral flexion and rotation. R. 396. Plaintiff's neurological examination was normal except for some weakness of dorsiflexion of her toes. R. 396. Dr. Clarke assessed plaintiff as having chronic low back pain with failed low back surgery, depression, complaints of

shortness of breath, gastroesophageal reflux disease (GERD), arthritis, and headaches. R. 396. With respect to her functioning, Dr. Clarke opined that plaintiff "would have difficulty doing any type of physical labor due to her chronic back pain . . . [and] [h]er chronic depression would make it difficult for her to concentrate on mental tasks." R. 397.

On June 8, 2010, Plaintiff complained of back and leg pain, rated at a "5." R. 365, 402, 434. Dr. Hoshino noted that she appeared anxious and diaphoretic. R. 365. An examination revealed tenderness of the coccyx and lumbar spine and paravertebral muscles, and tenderness of both knees. R. 365. On examination, she had no paresthesias, no weakness, and her straight leg raising test was negative, with a notation that it causes knee pain. R. 365. Moreover, plaintiff had normal strength, sensation, and deep tendon reflexes. R. 365. Plaintiff had good range of motion of her knees, but reported pain. R. 365. Dr. Hoshino diagnosed back pain, joint disease of both legs, cervicalgia, hypertension, and chronic pain syndrome. R. 366, 403, 434. Methadone was prescribed. R. 366. X-rays of plaintiff's knees were negative. R. 421, 457.

On September 9, 2010, plaintiff reported abdominal pain and had low back tenderness. R. 399, 431. She rated her pain as a "6." R. 431. An examination continued to note tenderness in the spine and coccyx. R. 399, 431. Notes indicate straight leg raising test was negative, but caused some knee pain. R. 399, 431. Her diagnoses included unspecified back pain, chronic pain syndrome, tobacco use disorder, and epigastric abdominal pain. R. 400, 432. On October 21, 2010, Plaintiff rated her pain at a "5." R. 429. Notes indicate she was "pleasant, happy, smiling." R. 429.

Charles D. Goldstein, M.D., examined plaintiff in November 2010, upon a referral for cholelithiasis (gall stones). R. 427-28. The plan was for plaintiff to undergo a cholecystectomy (gall bladder removal), R. 428, which she then underwent in January 2011. R. 462.

On December 14, 2010, Dr. Hoshino documented that plaintiff stated that her pain was "reasonably controlled with her current regimen" and that she had no medication side effects. R. 424. Plaintiff rated her pain at a "5." R. 424. Plaintiff's straight leg raising test was negative but with knee pain, and she had a normal neurologic examination. R. 424.  No changes were noted at another follow-up with Dr. Hoshino on February 8, 2011, except she rated her pain at a "6." R. 465-466.

At Mr. Shreaves's attorney's request, Dr. Hoshino completed a narrative regarding Plaintiff on February 9, 2011. R. 422-23, 461-62.  Dr. Hoshino noted that Plaintiff originally injured her back in July 2005 on a trampoline. R. 422, 461. She described persistent lumbar spine pain that radiated to both legs in the anterior thigh, knee, and medial lower leg areas. R. 422, 461. Plaintiff underwent a lumbar laminectomy at L4-5 in October 2006. R. 422, 461. Plaintiff reported no improvement following the surgery. R. 422, 461.  Plaintiff also had epidural steroid injections and physical therapy in the past without any significant improvement. R. 422, 461. Dr. Hoshino found that Plaintiff was unable to sit or stand for any length of time due to her symptoms, and that walking was worse. R. 422, 461. She could not lift more than 10 pounds, and could not perform any strenuous activities, but had no upper extremity symptoms or limitations. R. 422, 461. She was depressed and anxious because her chronic pain and an inability to work. R. 422, 461. Dr. Hoshino reported that plaintiff "overall feels the medications help her and make her pain tolerable." R. 422, 461. Dr. Hoshino diagnosed lumbar spondylosis with radiculopathy, chronic pain syndrome, failed back surgery, and depression with anxiety. R. 422, 461.  He concluded the letter to plaintiff's attorney stating, "I feel she is totally and permanently disabled by her condition." R. 422, 461.

On March 14, 2011, Plaintiff stated that she felt "fairly well". R. 463.  She had ongoing

lower back pain (LBP), which she rated at a "6," but her medications helped. R. 463. Upon exam, Dr. Hoshino noted that Plaintiff continued to have tenderness in the coccyx, lumbar spine, and paralumbar muscles, as well as positive straight leg raising, absent ankle jerk and knee jerk bilaterally, and pain with heel and toe walking. R. 463.

In April 2011, Dr. Hoshino completed an attorney-prepared "Multiple Impairments Questionnaire." R. 473-80. Dr. Hoshino diagnosed chronic pain syndrome, back pain involving the lumbar and cervical spine, and depression. R. 473.  In support of his assessment, Dr. Hoshino stated that plaintiff had lumbar spine tenderness, positive straight leg raising test bilaterally, and absent knee and ankle reflexes. R. 473. Dr. Hoshino cited to x-rays of the lumbar spine showing post-surgical changes at L4 through S1 in the lumbar spine. R. 474. He stated that plaintiff's primary symptoms were chronic low back pain, depression, anxiety, malaise and fatigue. R. 474. On a 10-point scale, Dr. Hoshino rated plaintiff's pain at "6" and her fatigue at "8." R. 475. He opined that in an 8-hour workday, plaintiff could sit for a maximum of 4 hours, and stand/walk for 0-1 hour. R. 475. He further opined that plaintiff could frequently lift up to 5 pounds, and could occasionally lift up to 20 pounds. R. 476. The doctor also found that Plaintiff was markedly limited (defined as effectively precluded) from using her hands for reaching (including overhead). R. 477. Dr. Hoshino stated that plaintiff's condition did not interfere with her ability to keep her neck in a constant position. R. 477.  Anxiety and depression contributed to the severity of Plaintiff' symptoms and functional limitations. It was noted that she is not a malingerer. R. 478.  He listed plaintiff's work stress tolerance as "incapable of even low stress" and opined that her symptoms would frequently interfere with her attention and concentration. R. 478. She required breaks to rest every hour during an 8-hour workday for 10 minutes each time. R. 478.  Dr. Hoshino further opined that plaintiff would be absent from work more than three

times per month because of her impairments. R. 479. Dr. Hoshino reported that the symptoms and limitations identified in the questionnaire were present since 2006. R. 479.

The record is silent until a year later when Dr. Hoshino completed an identical multiple impairments questionnaire in April 2012. R. 538-45. This time, Dr. Hoshino rated plaintiff's pain at an "8" and her fatigue at a "10." R. 540. He also changed his opinion as to plaintiff's ability to sit and stand/walk -- 8 hours for sitting and 1 hour for standing/walking. R. 540. Further, Dr. Hoshino now found that plaintiff's condition interfered with her ability to keep her neck in a constant position. R. 542.

C.     Administrative Hearing Testimony – August 2, 2011

Plaintiff testified that she suffered from back pain that radiated to her arm and down her legs. R. 42. She attended physical therapy for a period of time, but it did not help. R. 42. Plaintiff stated that her medication "takes the edge off," but nothing takes her pain away, and the medication can make her sleepy. R. 43-44.

Plaintiff testified that she usually sits in a reclined position with her legs up to take pressure off her back. R. 45. She estimated that she can sit upright for 10 minutes at a time before she has a lot of pain. R. 45. She can stand for 10 to 12 minutes, before she needs to sit and elevate her legs. R. 45. Plaintiff also reported having difficulties with concentration when completing paperwork and reading. R. 46-47. She sleeps poorly at night, has crying spells, and is "very emotional." R. 51-55.

She testified both of her legs hurt "from the tops all the way down to the bone on the bottom part of [her] leg" due to arthritis. R. 47-48. She wears knee braces and takes medication to relieve the pain. R. 48.

Plaintiff has lived with her parents since 2007. R. 45. She stated that she does "basically

nothing" around the house on a daily basis. R. 46.  Plaintiff stated that she can take her plate to

the kitchen after eating, but cannot wash dishes or do any laundry. R. 46.  Her mother does most

of the household chores. R. 46.   She spends most of her time watching television. R. 47.

However, she reported difficulties remembering what she watches. R. 47.   Her mother has to

help her with showering and dressing every day. R. 52.  She drives once every three months to

see her doctor, which is a three minute drive. R. 52-53. Plaintiff stated that she had not had an

MRI of her spine since her surgery, because she has no way to pay for it. R. 49. Her primary care

doctor had recommended that she see a specialist, but she could not afford to. R. 49-50.

The vocational expert ("VE") testified about jobs available in the national economy for a

hypothetical individual of Plaintiff' age, education, and work history, who had the following

abilities and limitations:

- ability to sit for an hour and stand for five minutes, consistently on an alternate basis eight hours per day, five days per week – or at will – and subject to usual, customary breaks;
- the need to avoid heights, temperature extremes, and stair climbing;
- no repetitive neck turning;
- the need for simple, routine, unskilled jobs that are SVP[5] 1 or 2, involving one or two step tasks;
- jobs must require low stress, low concentration, and low memory;
- any production rate requirements must be low;
- jobs must involve little decision making and little exercise of judgment; and
- there can be little change in the workplace.

R. 59.  The VE testified that an individual with that vocational profile could perform the light

jobs of copier operator (which allows for a sit/stand option), library clerk, and gate tender, as

well as the sedentary jobs of credit clerk and information clerk, which also allow for an at will

sit/stand option. R. 60. The VE explained that *The Dictionary of Occupational Titles* does not

---

[5] "SVP," or specific vocational profile, is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles*  Appendix C.  An SVP of 1 or 2 means the job can be learned through a short demonstration, or in a period of up to 30 days. *Id.*

discuss a sit/stand option, but that her testimony was based upon her experience and specialized knowledge. R. 60-61. The VE stated that an individual who misses work more than one day every other month could not perform any of the jobs identified. R. 61. She also reported that an individual limited to sitting 4 hours and standing/walking 1 hour total could not perform substantial gainful activity. R. 61.

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper

standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d

514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus,

reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not

supported by substantial evidence on the record, or (B) the ALJ made an error of law.  *Coffman,*

829 F.2d at 517.

## IV. <u>ANALYSIS</u>

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of

these sections, be under age sixty-five, file an application, and be under a "disability" as defined

in the Social Security Act. The Social Security Regulations define "disability" for the purpose of

obtaining disability benefits under the Act as the inability to do any substantial gainful activity,

by reason of any medically determinable physical or mental impairment, which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months.  20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and

416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment"

which makes it impossible to do previous work or any other substantial gainful activity that

exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security

Administration provide that all material facts will be considered to determine whether a claimant

has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether

the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in

substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a

condition contained within the Social Security Administration's official listing of impairments,

(4) has an impairment that prevents her from past relevant work, and (5) has an impairment that

prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

      A.     <u>ALJ's Decision – September 1, 2011</u>

In his September 1, 2011 decision, the ALJ found that Plaintiff met the insured status requirement through December 31, 2009. R. 25. At step one of the five-step analysis, he concluded that Plaintiff had not engaged in substantial gainful activity since May 16, 2009, the alleged onset date. R. 25. At step two, the ALJ found that Plaintiff had a number of severe impairments including degenerative disc disease and depression.[6] R. 28. At the third step, however, the ALJ concluded Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 26.

After looking at the record, the ALJ found Plaintiff had the residual functional capacity (RFC) to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except mild to moderately limited in her performance of activities of daily living, interacting socially, and maintaining concentration, persistence and pace, and as a result of pain and depression limited to simple, routine, unskilled jobs SVP 1 or 2 in nature, requiring low stress, low concentration, low memory, jobs that are one or two step tasks, low production rate jobs, little decision making, and little change in the workplace, little judgment required, and with an opportunity to sit for an hour and stand for five minutes, consistently on an alternate basis eight hours a day and five days a week, or at will, and subject to usual, customary breaks, avoiding heights, temperature extremes,

---

[6] The ALJ found that the other alleged conditions, including hypertensive cardiovascular disease, hypertension and obesity, did not meet the requirements to be considered severe. R. 25-26.

and stair climbing, and no repetitive neck turning." R. 28.

At the fourth step, the ALJ found Plaintiff was not capable of performing any of her past relevant work. R. 31.  At step five, he found that with her age, education, and residual functional capacity, there were jobs that exist in the national economy that Plaintiff can perform. R. 31-32. The ALJ found that Plaintiff was capable of performing jobs such as copier/operator, library clerk, gate tender, credit clerk, information clerk, and interviewer. R. 32.  Based on these findings, the ALJ concluded that Plaintiff had not been under a disability as defined by the Social Security Act. R. 33.

Plaintiff argues the ALJ (1) failed to follow the treating physician rule, and (2) failed to properly evaluate Plaintiff's credibility. Pl.'s Mem. 10, 15.  The Court cannot find substantial evidence in the record to support the ALJ's decision due to the ALJ's failure to appropriately address the medical opinions in the record as well as failing to support his assessment of Plaintiff's credibility.

B.   The Court Cannot Find Substantial Evidence to Support the ALJ's Decision Where the ALJ Failed to Properly Consider the Opinion Evidence When Determining Plaintiff's Residual Functional Capacity

Plaintiff objects to the ALJ's findings because the ALJ failed to give Dr. Hoshino's opinions great weight, and failed to properly consider the factors outlined in 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6). Pl.'s Mem. 10-11. Defendant argues that the ALJ correctly discounted Dr. Hoshino's opinions, as they are inconsistent with the record and are not substantiated by his own treatment notes. Def.'s Mem. 14, ECF No. 14.  The Court finds the ALJ committed error by (1) failing to address all necessary factors, as required by the regulations, prior to discounting Dr. Hoshino's opinions, and (2) failing to assign any weight to the opinion of the consultative examiner. R. 30-31.

15

The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. §§ 404.1545(a). The RFC is a claimant's maximum ability to work despite her limitations. *Id.* at 404.1545(a)(1). The determination of RFC is based on a consideration of all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1545(a)(3).[7] The ALJ is required to explain in his decision the weight assigned to *all* opinions, including treating sources, non-treating sources, state agency consultants, and other nonexamining sources. 20 C.F.R. § 416.927(e)(2)(ii).

Under the federal regulations and Fourth Circuit case-law, a treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(c)(2). Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. However, if a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. SSR 96-2, 1996 WL 374188, at *5 (S.S.A.); *See Burch v. Apfel*, 9 Fed. App'x 255, 259 (4th Cir. 2001) (per curiam); *see also Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000) (joining other federal courts in requiring the ALJ to consider § 404.1527(c) factors when declining to give controlling weight to the treating physician's opinion, and noting that ALJ should consider factors on remand). Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent

---

[7] "Other evidence" includes statements or reports from the claimant, the claimant's treating, or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptom affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

of the treatment relationship; (3) the degree of supporting explanations for their opinions; (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6).

Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2, 1996 WL 374188, at *5 (S.S.A.). This specificity requirement is necessary because the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the records as a whole to determine whether the conclusions reached are rational.'

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Dr. Hoshino, Plaintiff's only treating physician during the relevant period, offered opinions on Plaintiff impairments on three occasions prior to the ALJ's decision. He completed a spinal impairment questionnaire in September 2009, a narrative in February 2011, and a multiple impairments questionnaire in April 2011. R. 311, 422-23, 473-80, 538-45.[8]     Dr. Hoshino consistently opined that, due to her pain and depression, Plaintiff was incapable of handling even low stress work, would need to take frequent breaks, and would likely be absent

---

[8] In April 2012, after the ALJ's decision, the ALJ completed an additional multiple impairments questionnaire. R. 538-45.

more than three times each month. R. 312, 478.  He opined her symptoms would interfere with

her attention and concentration. R. 478.  Further, Dr. Hoshino opined that Plaintiff was totally

and permanently disabled. R. 422, 461.

After briefly summarizing Dr. Hoshino's treatment notes (R. 26-27) and three opinion

documents (R. 30), the ALJ assigned Dr. Hoshino's opinion that Plaintiff was totally disabled

"little weight, as it is not supported by the information cited, which does not preclude all work

activity." R. 30.  The ALJ also found that "these opinions," presumably Dr. Hoshino's opinions

other than his opinion that Plaintiff was totally disabled, "are not given great weight because they

are not consistent with the treatment records, discussed above." R. 31.  The ALJ cites to

neurological exams reporting normal strength, sensation, symmetric deep tendon reflexes,

normal gait and negative Babinski. R. 31.  The ALJ further relies on Dr. Hoshino's report in

December 2010 that Plaintiff's pain was "reasonably controlled with the current regimen, level

5, with no medication side effects," and Dr. Hoshino's indication in March 2011 that Plaintiff

was taking medication and feels fairly well. R. 31.  Lastly, the ALJ notes that over time, Plaintiff

was in no acute distress, was alert and oriented, and was anxious and slightly diaphoretic. R. 31.

Aside from mentioning that Dr. Hoshino was a primary care physician (R. 26), and

concluding that his opinions are inconsistent with the treatment records, the ALJ fails to discuss

the factors outlined in the regulations, which must be considered if the treating physician's

opinion is not given controlling weight. *See* 20 C.F.R. §§ 404.1527(d)(2)-(6) and 416.927(c)(2)-

(6).  Dr. Hoshino was Plaintiff's only treating physician for the applicable time period.  Further,

the information the ALJ relied upon to discount Dr. Hoshino's opinions, which is summarized in

the preceding paragraph, does not contradict Dr. Hoshino's opinions.  Dr. Hoshino did not opine

that Plaintiff has neurological impairments.  Moreover, the fact that on two occasions Plaintiff's

18

pain was reasonably well controlled and she felt fairly well is not inconsistent with Dr. Hoshino's opinion that she could not handle even low stress work, would need frequent breaks, and would likely be absent more than three days per month due to her symptoms.  Consequently, the ALJ has failed to adequately explain his finding that Dr. Hoshino's opinions are inconsistent with the treatment records.

Dr. Hoshino consistently noted that clinical examination of Plaintiff revealed tenderness of the lumbar spine, coccyx, or paralumbar region. R. 322, 326, 346, 348, 362, 380, 384, 399, 402, 424, 431, 463, 465.  Plaintiff's straight leg raising tests were across the board, with four positive tests (R. 279, 346, 348, 365, 402, 463, 465),[9] one negative test (R. 271, 338), and six negative tests that caused knee pain (R. 363, 365, 399, 402, 424, 431, 434, 439).  Defendant argues incorrectly that, "[n]one of [Dr. Hoshino's] examinations reflect that plaintiff had positive straight leg-raising bilaterally." Pl.'s Mem. 13.  To the contrary, all four of the positive straight leg-raising tests were positive bilaterally. R. 347, 349, 464, 466.

During her appointments with Dr. Hoshino, Plaintiff rated her pain on a ten-point scale as a "0" on three occasions (R. 332, 342, 445),[10] between a "3" and "4" on three occasions (R. 334, 336, 362, 379, 438, 440), a "5" on seven occasions (R. 271, 279, 322, 338, 346, 348, 365, 402, 429, 434, 443), a "6" on five occasions (R. 317, 326, 382, 431, 463, 465), a "7" on one occasion (R. 344), and an "8" on one occasion (R. 384).  Again, Defendant incorrectly summarizes the record by asserting Plaintiff "repeatedly assessed her pain at the level '5' on a 10-point scale. [] On one occasion, she rated it a '6,' [], but then on another occasion, she rated it at only a '4.'" Def.'s Mem. 13 (citations to the record omitted).

---

[9] The records from Plaintiff's visits to Dr. Hoshino are often duplicated in the record, and in some cases triplicated. Therefore, there are often multiple page citations to the same record.
[10] One of the visits where Plaintiff rated her pain as a "0," occurred during her annual gynecological exam.  R. 332.

In summary, following eighteen examinations of Plaintiff from September 2008 through March 2011, Dr. Hoshino diagnosed her with some combination of back pain, chronic pain syndrome, and depression. R. 322-23, 336, 338, 347, 349, 363, 380, 385, 400, 403, 425, 432, 443, 445, 324, 464, 466.  His treatment notes appear to be consistent with the opinions offered in his three opinion documents.  The ALJ's failure to properly analyze the factors listed in 20 C.F.R. §§404.1527(c)(2)-(6) and 416.927(c)(2)-(6) when assigning Dr. Hoshino's opinion "not [] great weight" makes it impossible for the Court to apply the substantial evidence test, as the ALJ has failed to sufficiently explain his finding that Dr. Hoshino's opinions were inconsistent with the other substantial evidence in the record.

The only other medical opinion in the record is that of Mark Clarke, M.D., who performed a consultative examination of Plaintiff on April 5, 2010, at the request of the Social Security Administration. R. 394-97.  Dr. Clarke's examination revealed that Plaintiff had some limitation of motion in her back, moderate crepitus of the knees, flexion of the knees limited to 105 degrees bilaterally, flexion of the hips to 90 degrees, some tenderness of the lower back, flexion of the spine to 65 degrees, poor spine extension, and slightly decreased lateral flexion and rotation. R. 396, 398.  Dr. Clarke assessed plaintiff as having chronic low back pain with failed low back surgery, depression, complaints of shortness of breath, gastroesophageal reflux disease (GERD), arthritis, and headaches. R. 396. Dr. Clarke opined that plaintiff "would have difficulty doing any type of physical labor due to her chronic back pain . . . [and] [h]er chronic depression would make it difficult for her to concentrate on mental tasks." R. 397.

The ALJ summarized Dr. Clarke's opinion, but failed to assign the opinion weight. R. 31. Instead, the ALJ concluded he "does not find that back pain and depression would have to preclude all work related activities." R. 31.  Dr. Clarke's opinion does not appear to be

inconsistent with that of Dr. Hoshino.  Consequently, the ALJ's failure to assign any weight to the opinion of Dr. Clarke leaves the Court to speculate as to the medical evidence the ALJ is relying upon to determine his RFC.

The ALJ failed to address the necessary factors when assigning Dr. Hoshino's opinions "not great weight," and failed to assign any weight to the opinion of Dr. Clarke, resulting in a decision that is not supported by substantial evidence in the record.  The undersigned recommends the case be remanded to the Commissioner so that the appropriate analysis of the medical opinions can be performed.

      C.      <u>The ALJ's Use of Boilerplate Language Calls Into Question His Credibility Determination</u>

Plaintiff's second assignment of error is based on the ALJ's credibility determination. Pl.'s Mem. 16.  The residual function capacity (RFC) determination must incorporate not only impairments supported by objective medical evidence, but also those impairments based on credible complaints made by the claimant. The ALJ uses a two-step analysis in evaluating a claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably produce the claimant's pain or symptoms. *Id.* In doing so, the ALJ must consider all relevant medical evidence in the record. *Id.*  If the underlying impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individuals' ability to work. *Id.* at 595. The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. *Id.* at 595-96.

In this case, Plaintiff claims that the ALJ applied an incorrect standard in finding that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible. Pl.'s Mem. 16. Plaintiff argues that the ALJ erred by evaluating Plaintiff's statements against the RFC determined by the ALJ, as opposed to the evaluating her statements against the evidence of record. *Id.* Defendant fails to address Plaintiff's argument. Def.'s Mem. 14.

In making his credibility determination, the ALJ acknowledged that Plaintiff's impairments could reasonably be expected to cause her alleged symptoms. R. 29. The ALJ then stated that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are *inconsistent with the above residual functional capacity assessment*." *Id.* (emphasis added).  This final statement of the ALJ appears as boilerplate language in any number of decisions by ALJs throughout the United States. *See e.g., Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). The Seventh Circuit in particular has been critical of the use of this verbiage, going so far as to call it "meaningless boilerplate [language]." *Parker*, 597 F. 3d at 922.

The use of this boilerplate language creates two problems. First, the Regulations instruct the ALJ to evaluate the consistency of a plaintiff's statements against all of the evidence of record, and not against just the ALJ's own RFC assessment. 20 C.F.R. § 404.1529(c)(4). The second problem is that the ALJ's conclusion regarding Plaintiff's credibility may indicate that the ALJ made his RFC determination before taking into account Plaintiff's credibility. Therefore, the ALJ could not have made his RFC determination using all of the information on the record, because he had not yet made his credibility determination for Plaintiff's statements. *See*

*Bjornson*, 671 F. 3d at 645 ("A deeper problem is that the assessment of a claimant's ability to work will often . . . depend[] heavily on the credibility of her statements."). The Court agrees with the Seventh Circuit that the ALJ stating that the he first made the RFC determination and then made a credibility determination "gets things backwards." *Id.*

Courts in the Eastern and Western districts of Virginia have found the Seventh Circuit's analysis of this issue to be applicable and persuasive. *See Roberts v. Astrue*, No. 1:12cv958, 2013 WL 5322807 at *12 (E.D. Va. Sept. 23, 2013) (Judge O'Grady) (finding the ALJ applied an incorrect legal standard in weighing plaintiff's statements in light of the RFC he had already established); *Little v. Colvin*, No. 2:12cv300, 2013 WL 2489173 (E.D. Va. June 7, 2013) (Judge Jackson) (finding the "boilerplate language calls into question whether the proper decisional process was undertaken by the ALJ in both reaching his RFC determination and evaluating the Plaintiff's credibility" and remanding for clarification); *Duff v. Astrue*, 5:11cv103, Dkt. No. 18, at *9 (W.D. Va. Nov. 30, 2012) (PACER) (Judge Welsh) (remanding based on the ALJ's use of the boilerplate language because this language allows the ALJ to assume what he wishes to prove). Courts have also found that use of the boilerplate language does not require remand where an ALJ has sufficiently supported his RFC and credibility determinations. *See Martin v. Colvin*, No. 5:12cv66, 2013 WL 4451230 at *7 (W.D. Va. Aug. 16, 2013) (Judge Urbanski); *Racey v. Astrue*, 5:12cv36, 2013 WL 589223, at *6 (W.D. Va. Feb. 13, 2013) (Judge Crigler).

In the present case, the Court is not comfortable finding that the ALJ considered all of evidence prior to making an RFC and credibility determination. The boilerplate language provides no evidence to support the ALJ's decision. As outlined above, the Court cannot find the RFC determination in this case was made with full consideration of all the evidence on record. Therefore, it would be illogical for the Court to accept the ALJ's conclusion that

Plaintiff's statements are not credible because they are inconsistent with the RFC determination. Remand is recommended to allow the Commissioner to properly evaluate Plaintiff's statements about her alleged symptoms.

## V.  RECOMMENDATION

For the foregoing reasons, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 11) be GRANTED; the Commissioner's Cross Motion for Summary Judgment (ECF No. 13) be DENIED; and the final decision of the Commissioner be VACATED and REMANDED for further analysis consistent with this Report and Recommendation.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this

court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).


_____/s/_____

Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
November 5, 2013